GREGORY S. WALSTON, State Bar No. 196776
WILLIAMS WALSTON LLP
225 Bush Street, 16th Floor
San Francisco, California 94104
Tel: (415) 269-3208
Fax: (415) 474-7108

ATTORNEYS FOR PLAINTIFFS KIMBERLY JONES,
JANE ROE NUMBER ONE, JANE ROE NUMBER TWO,
JANE ROE NUMBER THREE, JANE ROE NUMBER FOUR,
AND JANE ROE NUMBER FIVE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY JONES, et al.<br><br>Plaintiffs,<br><br>v.<br><br>DÉJÀ VU INC., et al.,<br><br>Defendants. | Case No. C-05-0997 BZ<br><br>**DECLARATION OF KIMBERLY JONES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: June 15, 2005<br>Time: 10:00 a.m.<br>Courtroom G |

I, Kimberly Jones, declare as follows:

1. I am a plaintiff in this action.

2. I have numerous past and present connections to the adult entertainment industry in San Francisco.

3. I worked as a dancer at Hungry I from about February 2004 until approximately December 2004, and I am not sure of my current status at Hungry I, since I never gave notice of resignation and never received notice of termination. Shortly before filing this action, I was asked by Hungry I management to work there for a night because they were very busy, but I declined.

4. Shortly before working at Hungry I, I applied for dancing jobs at two other Déjà Vu clubs. I applied to work at Century Theater three times in or about January and February 2004. At each of these occasions, I danced for, and spoke with, the manager on duty. The manager explained what my responsibilities would be, what shifts I would be expected to work,

and so on.  I was also given the opportunity to look around the club, and I found them very dirty and saw various evidence of prostitution.

     5.     Shortly before working at Hungry I, I also applied to work at Little Darlings on one occasion in or about February 2004.  Like Century Theater, I danced for the manager, spoke with him about dancers' responsibilities, and had the opportunity to look around the club.  At the conclusion of this interview, the manager said he though I would fit in better at Hungry I, and he personally escorted me to Hungry I (which is only half a block away), where I was hired.

     6.     I personally know numerous women – approximately thirty – who work in the adult entertainment industry.  I believe I personally know at least one dancer from each Déjà Vu club in San Francisco, and I specifically recall knowing dancers from the following Déjà Vu clubs: Hungry I, Century Theater, Broadway Showgirls, Roaring 20's, Gold Club, Garden of Eden, Little Darlings, Market Street Cinema, and LA Gals.  Like all friends, these women frequently confide in me and share their personal experiences with me.

     7.     I filed this action because I sincerely believe that Déjà Vu clubs do not treat dancers fairly or even lawfully.  Generally speaking, dancers who are, in theory, independent contractors are treated oppressively by managers, who tell them when to arrive at work, what to wear, what to do while at work (which often involves sex), when to take breaks, and when they can leave.  These situations are exacerbated because dancers are generally intimidated by managers, who are generally large men who take drugs on the job and treat dancers poorly.  Further, dancers are commonly required to work under conditions that are not even safe.  In other words, I am pursuing this matter to change Déjà Vu clubs' unfair and unlawful treatment of their dancers.

     8.     When I came to work at Hungry I, I was told I by the manager that I had to sign a contract.  The manager explained that I could work under an "independent contractor" contract or an "employee" contract, but nobody should work under the "employee" contract so I should sign the other one.  The manager then explained what my responsibilities would be under my contract – e.g., that I had to show up on the days and times he assigned me and "look good" when I came to work.  He never explained any waiver of my rights in the contract.  Since I saw the words "Do Not

WILLIAMS WALSTON
225 Bush Street, 16th Fl.
Tel: (415) 269-3208
Fax: (415) 474-7108

- 2 -

Declaration of Kimberly Jones          Jones v. Déjà Vu, Case No. C-05-0997 BZ

Sign Unless You Have Read This" or something to that effect, I asked him if I should read it. He replied "not really," and stared at me. I then signed the contract.

9. Although I know dozens of dancers who have signed these "independent contractor" agreements, none of them has ever indicated that she knows about any waiver of rights in them. To my knowledge, managers always tell them to sign the "independent contractor" agreement without reading them, and the dancers do. I am aware of only one dancer at Hungry I who worked under the "employee" agreement rather than the "independent contractor agreement," and I do not know why or how this one dancer wound up working under the "employee contract."

10. Managers do not make any distinction between dancers working under "independent contractor" agreements and "employee" agreements. They exercise equal control over every dancer, as set forth in greater detail below.

11. While I was at Hungry I, all dancers were required to show up to work on the day they were assigned, and were further required to be there no later than 6 p.m. We were fined $20 to $40 every time we were late or missed a shift. The fines were rarely, if ever consistent.

12. We were sometimes allowed no breaks whatsoever, and, at most were allowed only four breaks per night (depending how busy things were), and we were reprimanded every time our break exceeded 10 minutes.

13. Management also makes us do work that has nothing to do with exotic dancing. At a various times every night, we were required to clean the stage. All dancers were given rags and cleaning solution and were told to get up on stage and wipe it down. I was particularly embarrassed by this, as the patrons would yell demeaning things about women when they saw us being forced to clean the stage.

14. Further, at least once per hour, management requires the dancers to assemble on stage, turn around, and bend over for the crowd. Everyone hates this, including myself, and nobody wants to do it. We have no choice.

15. They required us to wear high heels. I had a problem with this because it needlessly increased our risk of injury. In particular, I do not think there was anyone else cleaning Hungry I other than the dancers. The premises were usually filthy and certainly very dark.

Several times, I twisted my ankle because I stepped on some piece of debris while wearing high heals, and the floor boards were uneven, especially on the stairs leading to the dressing room.

16. We were required to perform stage dances as well as lap dances. In particular, I had to perform stage dances whenever it was "my turn," and I was not free to decline. Further, management has certain rules we must follow when performing a stage dance.

17. All dancers are required to give patrons lap dances, and I was certainly never free to refuse. In particular, there was one patron who took a liking to me, although I found him disgusting. Nevertheless, I was directed to give him numerous two-for-one lap dances (i.e., I was only paid for one), and I certainly was not free to refuse. Worse yet, since this particular patron apparently knew the manager, I was often directed to perform special dances, i.e., extra long, and was often required to do so for free or at a discount.

18. Further, at certain times, all dancers are required to give lap dances, i.e., when lap dances are "on special" such as the 2-for-1 special or the 1 dollar, 1 minute special. We would be reprimanded – i.e., yelled at by a manager – if we refused to give these lap dances.

19. The fact that Dancers are not free to decide when to dance sometimes requires dancers to work under unsafe circumstances. For example, on one occasion, somebody vomited on stage. On another occasion, the manager allowed a dancer to work who had open sores around her crotch, which came in contact with the same stage pole that all other dancers used to dance, including myself (this is not the same incident discussed in the Declaration of Jane Roe No. Five – I was not working at Hungry I at that time). I certainly would have liked to have declined any further stage dances these nights, but I was not free to do that. I had to dance on the stage nonetheless.

20. Management also requires dancers to attend frequent meetings, where we are told, over and over again, when we are to arrive at work, not to take breaks exceeding 10 minutes, not to take any breaks after 10 p.m., and the various other rules discussed in this Declaration.

21. I have never seen any postings at Hungry I advising dancers of their rights. The only postings I can recall were admonitions not to break the various rules discussed in this Declaration.

22. I am aware from my numerous friendships with other dancers and my general understanding of this industry, that other Déjà Vu clubs have the same policies and rules for their dancers to follow as the ones discussed in this Declaration. Dancers are generally aware that the various Déjà Vu clubs function in concert – indeed, when I applied for work at Little Darlings, the manager told me I would fit in better at Hungry I and he took me there himself.

23. I have heard many dancers comment on Déjà Vu clubs' bias against African American, Latina, and other non-Caucasian dancers, and I agree. It is generally acknowledged among people in the industry that managers believe that "gentlemen prefer blonds," and accordingly have a preference for Caucasian dancers, especially blondes.

24. This preference for Caucasians, and concomitant bias against non-Caucasian dancers, particularly African Americans, has a clear manifestation in the industry. Generally speaking, there is a hierarchy among dancers, inasmuch as some dancers are simply more desired by clubs than others. At the top are dancers who have built up a large following of patrons who will come to a club to see them specifically. These dancers typically make several hundred dollars every night, and sometimes make several thousand. They are almost always white.

25. While few dancers are at the top of the industry, there are many dancers who are at the bottom of the industry. There are several Déjà Vu clubs, such as Market Street Cinema and LA Gals, that are simply less desirable for dancers to work at, as dancers there generally make less than $100 per night. Most dancers who work at these clubs are not welcome at the other clubs, and they are disproportionately African American – i.e., between 25% and 50% on most nights, sometimes more. There are far fewer Caucasian dancers than non-Caucasians.

26. I know women from both the top and the bottom of this industry, and the quality of employment conditions experienced by dancers at the top of the industry and those at the bottom is remarkable. Dancers at the top make enough money that paying their stage fees is not an issue. Dancers at the bottom work with patrons who have hardly any money to spend, and are constantly worried about making enough money to pay their stage fees; there are frequent jokes about them breaking even because they bought a value meal on the way home. Significantly, it is generally

known among dancers that prostitution is the only way to make money while working at the less desirable clubs.

     I declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge, that I am competent to testify as a witness, and that I would so testify if called as a witness. Executed April __, 2005 in San Francisco, California.

_____
KIMBERLY JONES

WILLIAMS WALSTON
225 Bush Street, 16th Fl.
Tel: (415) 269-3208
Fax: (415) 474-7108

Declaration of Kimberly Jones

- 6 -

Jones v. Déjà Vu. Case No. C-05-0997 BZ